UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BARBARA NUSS, Individually and as
Executor of the ESTATE OF ROBERT A.
NUSS,

                    Plaintiffs,

        -against-                                                7:10-CV-0279 (LEK/TWD)

JOSEPH WILLIAM SABAD and VICKI
ANN SABAD,

                    Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

Plaintiffs Barbara Nuss ("Barbara") and the Estate of Robert A. Nuss ("Robert")

(collectively, "Plaintiffs") commenced this action against Defendants Joseph William Sabad

("Joseph") and Vicki Ann Sabad ("Vicki") (collectively, "Defendants"), alleging several causes of

action arising from an arrangement to acquire land in Mexico. See generally Dkt. No. 1

("Complaint").  Currently pending before the Court is Defendants' Motion for summary judgment.

Dkt. No. 50 ("Motion").  For the following reasons, the Motion is granted in part and denied in part.

## II.   BACKGROUND

The facts of this case are widely disputed, but the parties agree about the following:

Plaintiffs and Defendants first met sometime in late 2002 or early 2003.  Dkt Nos. 50-29 ("SMF")

¶ 2; 85 ("SMF Response") ¶ 1.  In 2003, they entered into an arrangement to acquire land in

Mexico.  SMF ¶¶ 2-5; SMF Resp. ¶¶ 2-5.  In March 2003, Plaintiffs wired $135,000 to Defendants'

bank account in New York.  SMF ¶ 8; SMF Resp. ¶ 8.  A Mexican corporation was formed in that

same month as a vehicle for acquiring the Mexican property, and Robert, Barbara, Joseph, and Vicki each received 25% of the shares. SMF ¶¶ 5-7; SMF Resp. ¶¶ 5-7. Following the corporation's acquisition of the property, Plaintiffs began constructing a vacation home on part of the parcel, which they eventually lived in. SMF ¶ 14; SMF Resp. ¶ 12. Defendants began constructing some smaller structures, including a guard house. SMF ¶ 12; SMF Resp. ¶¶ 12, 14. In 2006 or 2007, a disagreement arose between the parties as to the future use of the land. SMF ¶¶ 14-17; SMF Resp. ¶ 14. Later that year, at a shareholders' meeting of the corporation that Plaintiffs did not attend, Defendants voted to issue themselves additional shares, thereby diluting Plaintiffs' interest in the property. SMF ¶¶ 17-18; SMF Resp. at 10-11.

### A. The Arrangement

The circumstances under which the parties met each other and learned of the Mexican beachfront property they eventually acquired (the "Property") are disputed. According to Plaintiffs, Robert met Joseph before either knew of the Property. SMF Resp. ¶¶ 1-2. Robert later invited Defendants to meet his wife, Barbara. Dkt. No. 84-1 ("Nuss Deposition") at 27-28. Robert Nuss and Joseph Sabad began jointly searching for Mexican real estate to purchase in 2002. SMF Resp. ¶ 1. Together they viewed at least two properties before deciding to purchase the Property. Id. Robert and Joseph first saw the Property in December 2002. Id. ¶ 2. Robert and Barbara saw the Property together at the beginning of 2003. SMF Resp. ¶ 2.

Defendants claim to have found the Property on their own, and to have negotiated its purchase and made a down payment in February 2003. SMF ¶ 1. In Defendants' version of events, Plaintiffs learned of the Property later, in March 2003, when Joseph pointed it out to Robert while they were driving home from a golf outing. Id. ¶ 2.

2

At the time of acquisition, the parties' stated intentions were to use the property to construct separate private vacation homes. SMF ¶ 4; SMF Resp. ¶ 4.[1] They planned to share the expenses of buying, developing, and maintaining the land on a "dollar-for-dollar basis." SMF ¶ 3; SMF Resp. ¶ 3.

The nature of the parties' relationship during this early period is disputed. Plaintiffs claim that Defendants were friendly and gained Plaintiffs' trust through their kind words and deeds. SMF Resp. ¶ 1; Nuss Dep. at 150-51. Defendants state that, prior to the formation of the corporation, they "barely knew" Defendants and were merely acquaintances, not friends. Reply Decl. ¶¶ 3, 15.

**B. Acquisition of the Property and Formation of the Corporation ("BRJV")**

On March 26, 2003, Plaintiffs wired $135,000 from their Salomon Smith Barney account to Defendants' NBT Bank account in New York. SMF ¶ 8; SMF Resp. ¶ 8; Dkt. No. 15-3, Ex. A. The purchase price of the property was 1,740,000 pesos, equivalent to $163,500. SMF ¶ 9; SMF Resp. ¶ 9. As part of the arrangement for acquiring the property, a Mexican corporation was formed on March 27, 2003. SMF ¶ 5; SMF Resp. ¶ 5. The corporation was named BRJV (the first initials of the four shareholders). SMF ¶ 5; SMF Resp. ¶ 5; Dkt. No. 86 ("Response") at 2 n.1.

The legal documents concerning the acquisition of the land and the formation of BRJV were drafted by a Mexican attorney/notary named Lomeli. Reply Decl. ¶ 2. Defendants state that they met Lomeli for the first time on February 7, 2003, when they made the deposit on the land. Id.; Dkt. No. 90-1 ("Deposit Receipt"). Plaintiffs claim that Defendants had sole control over the creation

---

[1] In the declaration accompanying their Reply brief, Defendants contradict their own Statement of Material Facts, stating that they intended to construct a residence for themselves and develop the rest of the property into additional houses or condominiums. Dkt. No. 90 ("Reply Declaration") ¶¶ 2-4.

and formation of BRJV and that they completely trusted Defendants in this process. SMF Resp. ¶ 5.

None of the parties is fluent in Spanish, although Plaintiffs believed that Joseph Sabad had a limited ability to read Spanish. Reply Decl. ¶ 8; Nuss Dep. at 19, 153-54.

BRJV was formed under the Mexican *Ley General de Sociedades Mercantiles*, or General Law of Commercial Companies ("GLCC"). Compl. Ex. A ("BRJV Constitution"); SMF Resp. at 9; Reply Decl. ¶ 9. The GLCC requires that increases in or reductions of the Capital Stock of a company can occur only at a General Extraordinary Meeting, rather than at a General Ordinary Meeting. GLCC art. 182; SMF Resp. at 9-10. At least three-fourths of the Capital Stock must be represented at an Extraordinary General Meeting, unless the by-laws provide for a higher proportion. GLCC art. 190; SMF Resp. at 9. The BRJV Constitution provided that any increase or decrease of "the minimum fixed Capital" had to be resolved at a General Extraordinary Meeting, but an increase or decrease of "Variable Capital" could be resolved at a General Ordinary Meeting. BJRV Const. cls. 9, 23; SMF Resp. at 10. Defendants state that they did not instruct Lomeli to place any provision into the Constitution other than the parties' names, addresses, number of shares, and subscription price. Reply Decl. ¶ 8.

### C. Improvements to the Property

Following the formation of BRJV and the acquisition of the Property, Robert Nuss, acting on behalf of BRJV, sought building permits for the two vacation homes. SMF ¶ 10; SMF Resp. ¶ 10. The permits were paid for with BRJV funds. SMF ¶¶ 10-11; SMF Resp. ¶¶ 10-11. Joseph, acting as President of BRJV, directed the construction of certain improvements to the land, such as roads, electrical lines, water holding tanks, septic systems, roads, a guard house, and a palapa/chickee hut. SMF ¶ 12; SMF Resp. ¶ 12. Robert Nuss knew about these activities and approved them through

4

emails to Joseph Sabad. SMF ¶ 13; SMF Resp. ¶ 13. Plaintiffs built a beachfront vacation home on the Property, which they contend cost $320,000 and was paid for by them, not BRJV. SMF ¶ 4; SMF Resp. ¶ 12.

In 2006, Defendants initiated discussions to split the Property. SMF ¶ 14; Dkt No. 50-1 ("Defendants' First Declaration") ¶¶ 21-24. Plaintiffs would own "almost half" the property through a new corporation, including the part where they had built their house. SMF ¶ 14; Defs.' First Decl. ¶¶ 21-24; Nuss Dep. at 110. Defendants would own the rest of the Property through BRJV, of which they would be the sole owners. SMF ¶ 14; Defs.' First Decl. ¶¶ 21-24.

### D. The January Meeting

A BRJV corporate board meeting was held in January 2007. SMF ¶ 17; Resp. ¶ 14. At that meeting, the parties advanced differing proposals as to the future of the Property. SMF ¶ 17; SMF Resp. ¶ 14. Defendants proposed developing the land into condominiums. SMF ¶ 17; SMF Resp. ¶ 14. Plaintiffs state that the first time they heard of this proposal was at the January meeting. SMF Resp. ¶ 14. Plaintiffs opposed that proposal and advanced their own proposal to divide the property, which Defendants opposed. SMF ¶ 17. Due to this deadlock, no action could be taken by BRJV. See SMF ¶ 17; Defs.' First Decl. ¶¶ 28-29.

### E. The September Meeting

On September 18, 2007, a BRJV shareholders meeting was held. SMF Resp. ¶ 4; Reply Decl. ¶ 12. A notice of the meeting was published in a Spanish-language Mexican newspaper. Reply Decl. ¶ 12; SMF Resp. ¶ 14. Plaintiffs state that this form of notice was inconsistent with Defendants' previous practice of verbally notifying them of upcoming meetings. SMF Resp. ¶ 14. Defendants were present at the meeting; Plaintiffs were not. SMF ¶ 4; Reply Decl. ¶ 12. At the

5

meeting, Defendants voted to issue themselves each 5000 new shares. As a result, following that meeting, Defendants together owned 10,500 shares of BRJV stock, while Plaintiffs together owned 500 shares. SMF Resp. at 10-11; Reply Decl. ¶¶ 12-13. At that meeting, Defendants determined that BRJV owed them a debt of $160,000. Reply Decl. ¶ 12. This debt was the consideration for the new shares. SMF Resp. at 11; Reply Decl. ¶ 12.

### F. Legal Proceedings in Mexico

In 2007, the parties initiated various legal proceedings against each other involving BRJV and the Property. Defendants state that these proceedings began in January 2007 and included immigration complaints seeking Defendants' deportation from Mexico. SMF ¶ 18; Reply Decl. ¶ 12; Dkt No. 80 ("Response to Antisuit Injunction Request") at 1-2. Plaintiffs admit initiating legal proceedings, but state that they did so to prevent Defendants from "continuing their fraud," "misappropriating Plaintiffs' property," and interfering with Plaintiffs' quiet enjoyment of their house in Mexico through death threats, physical violence, shooting, trespass, and other acts. SMF Resp. ¶ 18.

## III. PROCEDURAL HISTORY

Plaintiffs commenced this action on March 9, 2010. Compl. Their Complaint includes nine causes of action: (1) breach of an oral joint venture agreement; (2) breach of fiduciary duty; (3) an accounting; (4) rescission of the oral joint venture agreement; (5) imposition of a constructive trust; (6) fraudulent misrepresentation; (7) conversion; (8) unjust enrichment; and (9) a request for a declaratory judgment. Compl. ¶¶ 52-119. Defendants moved to dismiss for lack of personal jurisdiction, or alternatively, based on *forum non conveniens* grounds. Dkt. No. 12-5. On September 7, 2011, the Court denied Defendants' Motion to dismiss in its entirety, finding, *inter*

*alia*, that although the Complaint discusses extensively a number of events that occurred in Mexico, the events were allegedly in furtherance of a fraud that occurred in New York. Dkt. No. 26. Defendants filed an answer and counterclaimed for breach of fiduciary duty under the alleged joint venture agreement. Dkt. Nos. 27, 44.

Defendants filed their Motion for Summary Judgment and supporting Memorandum of law on August 14, 2012. Mot.; Dkt. No. 50-30 ("Memorandum"). Nearly a year of contentious discovery ensued. <u>See generally</u> Dkt. Plaintiffs filed their Response in opposition to the Motion on May 24, 2013. Dkt. No. 86 ("Response"). Defendants filed a Reply brief on June 14, 2013. Dkt. No. 90 ("Reply").

## IV.     ADMISSIBILITY OF THE FORMER ATTORNEY'S DECLARATION

On April 16, 2013, Defendants notified the Court that, in response to Defendants' First Set of Interrogatories, they had received a sworn declaration (the "Declaration") from a Mexican attorney who formerly represented Defendants (the "Attorney"). Dkt. No. 73 ("Defendants' Motion for Protective Order"). Defendants objected that the Declaration contained privileged communications and sought a protective order to keep the Declaration and its contents confidential. <u>Id.</u> Plaintiffs responded that, under Mexican law, the communications were not privileged. Dkt. No. 74-1 ("Pugliese Declaration"). On April 18, 2013, the Court ordered the parties not to disclose the declaration or publish it until further discussion with the Court. Text Order of April 18, 2013. After Plaintiffs sought to file an unredacted copy of the Declaration in support of their Response, Defendants filed a letter motion in opposition. Dkt. Nos. 85-1; 92. The Court granted Plaintiffs' request to file an unredacted copy of the Declaration with the Court, and directed the parties to file letter briefs addressing whether: (1) Mexican or New York law applies to the issue of admissibility;

and (2) if New York law applies, whether the disputed statements are admissible.  Text Order of July 26, 2013.

Plaintiffs argue in their Letter Brief that Mexican law does not recognize a privilege for statements made by a client to his attorney, and that such statements are instead governed by the Mexican Professional Secrets Doctrine (the "PSD").  Dkt. No. 97 ("Plaintiffs' Letter Brief") at 2.  The PSD, according to Plaintiffs, both allowed and obligated Defendants' former attorney to make the Declaration because Defendants had evinced a clear intent to harm Plaintiffs in the future.  Id.  Plaintiffs assert that because the Attorney is not a New York lawyer and had no interaction with New York, the privilege issue does not implicate New York law.  Id.  Nevertheless, Plaintiffs argue that, were New York law to apply, the statements in the Declaration would be admissible under the crime-fraud exception to the attorney-client privilege.  Id. at 5.

Defendants assert that because Plaintiffs chose New York as the forum, they must abide by New York law regarding attorney-client privilege.  Dkt. No. 98 ("Defendants' Letter Brief").  They also argue that, separate from any question of attorney-client privilege, the Declaration should be disregarded as irrelevant under Rule 403 of the Federal Rules of Evidence.  Id.

After reviewing the parties' submissions as well as the Declaration, the Court finds that a true conflict between Mexican and New York law has not been demonstrated.  Accordingly, the Court treats the issue under New York law, and finds that the crime-fraud exception does not apply.  The communications in the declaration are therefore privileged and inadmissible.

**A.  Choice of Law as to Admissibility**

*1.  Legal Standard*

"[I]n a civil case, state law governs privilege regarding a claim or defense for which state

law supplies the rule of decision." FED. R. EVID. 501. Because this diversity action involves state law claims and defenses, state law determines the issue of privilege. Federal district courts sitting in diversity cases apply the conflicts of law rules prevailing in the state in which they are situated. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); I.B.M. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004). Thus, the Court must apply New York choice of law rules in determining which jurisdiction's law governs the admissibility of the Declaration.

New York gives "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." Babcock v. Jackson, 191 N.E.2d 279, 283-84 (N.Y. 1963); see also Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 642 N.E.2d 1065, 1069 (N.Y. 1994) (describing Babcock interest analysis). "Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict." I.B.M., 363 F.3d at 143 (citing In re Allstate Ins. Co., 613 N.E.2d 936 (N.Y. 1993)). "Laws are in conflict '[w]here the applicable law from each jurisdiction provides different substantive rules.'" Id. (quoting Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998)). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." Id.; see also Nameh v. Muratex Corp., 34 F. App'x 808, 810 (2d Cir. 2002) (applying New York law where party advocating application of foreign law failed to produce sufficient evidence of conflict).

Additionally, Rule 44.1 of the Federal Rules of Civil Procedure states: "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

*2.  Discussion*

Despite Plaintiffs' substantial submissions as to Mexican law, they have not proved that it conflicts with New York's law on attorney-client privilege.  Although Plaintiffs make the bold assertion that in Mexico "there is no privilege for statements made by a client to his attorney," Plaintiff's Brief and its supporting documents reveal the existence of multiple functionally similar Mexican legal doctrines, as well as corresponding analogs to New York's crime-fraud exception to the privilege.  Pls.' Letter Br. at 2-4.

First, the declaration of Professor Reguart states that Mexican lawyers owe an obligation of secrecy to their clients under the governing Codes of Ethics.  Dkt. No. 85-2 ("Reguart Declaration") at 2-3 (citing CÓDIGO DE ÉTICA PROFESIONAL DE LA BARRA MEXICANA, COLEGIO DE ABOGADOS [CODE OF PROFESSIONAL ETHICS OF THE MEXICAN BAR], § 1, art. 12; CÓDIGO DE ÉTICA DEL ILUSTRE Y NACIONAL COLEGIO DE ABOGADOS DE MEXICO [CODE OF ETHICS OF THE ILLUSTRIOUS AND NATIONAL COLLEGE OF LAWYERS OF MEXICO], § 2.3.5).  Plaintiffs argue that Defendants' former attorney owes them no such obligation, because the Codes make an exception where the client informs the attorney of the intent to commit a crime, and in such cases the attorney *must* make the disclosures necessary to prevent the crime and protect the potential victims.  Id.

Second, the criminal codes of the states of Jalisco and Colima each criminalize the disclosure of secrets.  Reguart Decl. at 4-5 (citing EL CÓDIGO PENAL DE JALISCO [CRIM. CODE OF JALISCO], ch. 1, art. 143; CÓDIGO PENAL DE COLIMA [CRIM. CODE OF COLIMA], art. 16.V)  But in Jalisco there is an exception for "just cause," and in Colima there is an exception where the disclosure "is in fulfillment of a legal duty or lawful exercise of right."  Id.  Professor Reguart

concludes that, read in combination with the Codes of Ethics, disclosures such as the Attorney's in this case would not be criminally sanctionable in those states. Id.

Third, the codes of criminal procedure of Jalisco and Colima both provide that attorneys covered by the PSD cannot be compelled to testify, but if an attorney is willing to testify, he/she my do so. Id. at 5-8 (citing EL CÓDIGO DE PROCEDIMIENTOS PENALES DE JALISCO [CODE OF CRIM. PROC. OF JALISCO], ch. 4, arts. 195, 197; EL CÓDIGO DE PROCEDIMIENTOS PENALES DE COLIMA [CODE OF CRIM. PROC. OF COLIMA], ch. V, arts. 197, 200).

Fourth, Article 16 of the Political Constitution of the United Mexican States protects communications between criminal defendants and their attorneys, but nevertheless provides for voluntary disclosure where the communications contain information relating to the commission of a crime. Id. at 8-9 (citing CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS [CONST.], art. 16).

Contrary to Plaintiffs' assertion that no privilege exists in Mexico, attorney-client communications are protected by a web of state and federal laws. Plaintiffs rely on a crime-fraud exception to each of these doctrines, yet have not articulated a substantive difference from the New York crime-fraud exception.

The only apparent difference is more procedural in nature: whereas the court deciding a case determines the applicability of the crime-fraud exception to the attorney-client privilege, it is the attorney himself who decides whether the intent-to-commit-a-crime exception to the PSD allows and compels him to disclose client secrets. See Dkt. No. 97-3; SMF Resp. at 12. Plaintiffs have essentially framed the PSD and related Mexican doctrines as equivalent to the Rule of Confidentiality in the United States. That doctrine also contains a crime-fraud exception, but

because the duty pertains to all disclosures of confidential client information—not just those in a judicial proceeding—the invocation of the that crime-fraud exception might rest on a lawyer's own judgment, rather than a determination by a court. See N.Y. RULES OF PROF'L CONDUCT R. 1.6(b)(2), N.Y. COMP. CODES R. & REGS. tit. 22, § 1200.0 (allowing a lawyer to reveal confidential information "to the extent that the lawyer reasonably believes necessary . . . to prevent the client from committing a crime"); see also RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 67, cmt. h ("The crime-fraud exception to the attorney-client privilege is administered by a tribunal and applies only when a lawyer or another person is called upon to give evidence, whereas the [crime-fraud exception to the duty of confidentiality] concerns action that a lawyer may take on the basis of a reasonable belief and outside of any proceeding and thus without direction from a judicial officer."). Plaintiffs suggest that whether Defendants' Attorney is subject to discipline or prosecution in Mexico for his disclosures is irrelevant to whether the disclosures are admissible in this proceeding.[2]

But it remains unclear whether Defendants' submissions establish the existence of a conflicting substantive rule as to the confidentiality of client communications or are merely indicative of the different discovery procedures available in Mexico. See Ryan G. Anderson, *Transnational Litigation Involving Mexican Parties*, 25 ST. MARY'S L.J. 1059, 1075 n.62 (1994)

_____

[2] At least one court of appeals has held that district courts can enforce the duty of confidentiality where attorneys unilaterally invoke the crime-fraud exception and volunteer client communications. In Prudential Insurance. Co. v. Massaro, an in-house attorney made multiple disclosures to his employer's legal adversaries, including the filing of an affidavit in open court. 47 F. App'x 618, 619 (3d Cir. 2002). In affirming the district court's grant of a permanent injunction against the disclosure of any additional confidential or privileged information, the Third Circuit found that the attorney had no right to unilaterally invoke the crime-fraud exception, and that even if he acted in good faith, he breached his ethical duties by failing to comply with the procedural safeguards designed to protect clients from improvident assertions of the exception. Id.

(describing interrogatories, production of documents directly to opposing parties, and requests for admission promulgated by counsel as "alien to civil-law states such as Mexico" where evidence is gathered by the court); Diaske Yoshida, *The Applicability of the Attorney-Client Privilege to Communications with Foreign Legal Professionals*, 66 FORDHAM L. REV. 209, 209-10 (1997) (discussing correlation between scope of discovery and professional privileges in different countries).

Furthermore, three of the four provisions cited by Plaintiffs refer to *criminal* proceedings, suggesting that a fraud defendant might benefit from the heightened procedural safeguards typical of such proceedings. Plaintiffs' submission stating that "[u]nder Mexican law there is no civil wrong known as 'fraud' and therefore the appropriate legal manner to prosecute a fraud is as a criminal offense" only creates further confusion as to how the determination of criminal fraud in Mexico would translate into a *prima facie* showing of fraud in a U.S. civil suit. Dkt. No. 97-2.

Without further evidence clarifying the nexus between the PSD and Mexican discovery procedures in these various contexts, the Court cannot conclude that Mexican law should require a U.S. court to defer to a testifying attorney's determination as to the crime-fraud exception, and to leave the protection of confidential client information entirely to a foreign entity. See Codey ex rel. State of N.J. v. Capital Cities, Am. Broad. Corp., Inc., 626 N.E.2d 636, 642 (N.Y. 1993) ("[E]videntiary questions such as privilege are best resolved in the State—and in the proceeding—in which the evidence is to be used. Whether a particular communication or document is entitled to the cloak of privilege is a complex question that requires a balancing of values and policy choices."). Accordingly, the Court will apply the law of New York, the forum state. See SNS

Bank, N.V. v. Citibank, N.A., 777 N.Y.S.2d 62, 64 (App. Div. 2004) ("If there is [no actual conflict], then the law of the forum state where the action is being tried should apply".).

## B. Admissibility Under New York Law

In New York, the attorney-client privilege is codified in Rule 4503(a)(1) of the Civil Practice Law and Rules:

> Unless the client waives the privilege, an attorney or his or her employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof.

However, "the attorney-client privilege set forth in CPLR 4503(a) 'may not be invoked where it involves client communications that may have been in furtherance of a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct.'" Superintendent of Ins. v. Chase Manhattan Bank, 840 N.Y.S.2d 479, 482 (App. Div. 2007) (quoting Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker, 767 N.Y.S.2d 228 (App. Div. 2003). For the crime-fraud exception to apply, the party seeking disclosure must "articulate[] a sufficient 'factual basis for a showing of probable cause to believe that a fraud or crime has been committed, and that the communications in question were in furtherance of such fraud or crime.'" Chase Manhattan Bank, 840 N.Y.S.2d at 482 (quoting Matter of Grand Jury Subpoena, 767 N.Y.S.2d 77 (App. Div. 2003)). "[T]he crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Instead, the exception applies

only when the court determines that the client communication . . . in question was *itself* in furtherance of the crime or fraud." In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995).[3]

After reviewing the Declaration in light of the record, the Court finds that Plaintiffs have not provided sufficient facts showing that the confidential communications to the Attorney were in furtherance of a fraud or crime. Critically, the Attorney's professional relationship with Defendants began several years after the disputed events of 2003 that form the core of the alleged fraud on which Plaintiffs base both their substantive claims and their invocation of the crime-fraud exception. Even if Plaintiffs could make an adequate showing of fraud as to the events of 2003, that would not necessarily mean that the communications to the Attorney regarding those events were "in furtherance" of the fraud. See AP Links, LLC v. Russ, 09-cv-5437, 2012 WL 3096024, at *4 (E.D.N.Y. July 30, 2012) ("Even had the Plaintiffs demonstrated that there was probable cause to believe that a crime or fraud was perpetrated, they have nonetheless failed to produce any evidence to enable the reasonable conclusion that the [communications] at issue were in furtherance of and intended to facilitate the fraud or crime."). The communications at issue occurred after the relationship between Plaintiffs and Defendants had already broken down, and Defendants sought the Attorney's legal services in connection with the Mexican litigation arising out of that breakdown. The communications can therefore be deemed "in furtherance" of the fraud only if the Court accepts Plaintiffs' theory: subsequent legal actions taken by Defendants in Mexico were in service of a larger fraudulent scheme, i.e., the legal disputes arising in Mexico were part of Defendants' plan all along. But making such an inference is inappropriate for at least two reasons.

---

[3] New York law on attorney-client privilege is substantially similar to the federal doctrine. See AP Links, LLC v. Russ, 09-cv-5437, 2012 WL 3096024, at *2 n.6 (E.D.N.Y. July 30, 2012); Bowne of N.Y.C., Inc. v. AmBase Corp., 150 F.R.D. 465, 470-71 (S.D.N.Y. 1993).

First, even if one presumes a fraudulent purpose as to the events of 2003, the mere fact that Defendants discussed those events with an attorney in the course of soliciting legal assistance in a dispute arising from those events does not give rise to an inference that any legal assistance they sought was for a fraudulent purpose. Defendants would need to communicate with an attorney regarding those events in order to defend against charges concerning the alleged fraud, or—as in their version of events—to simply recover property that was rightfully theirs. SMF ¶ 18; Reply Decl. ¶¶ 10-12; see RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 82, cmt. e ("The [crime-fraud] exception does not apply to communications about client criminal or fraudulent acts that occurred in the past. Communications about past acts are necessary in defending against charges concerning such conduct.").

Second, drawing an inference in favor of the Plaintiffs on this critical issue—whether Defendants planned since 2003 to take full control of the land via the Mexican legal system—would inappropriately tip the balance of the case. See In re Omnicom Grp., Inc., 233 F.R.D. 400, 405-06 (S.D.N.Y. 2006) ("[A]ny findings by the court that would suggest a strong enough basis to infer the perpetration of a fraud when such fraud is an essential element of the plaintiffs' underlying claims in this case would, at the very least, potentially tilt the playing field of this lawsuit . . . ."); see also United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997) ("[I]f and when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies."); Linde v. Arab Bank, PLC, 608 F. Supp. 2d 351, 358 (E.D.N.Y. 2009) ("Courts have exercised their discretion to decline to apply the exception, particularly where it appears that it would . . . 'tilt the playing field . . . .'" (quoting United States v. Richard Roe, Inc., 168 F.3d 69, 71 (2d Cir. 1999))). Plaintiffs have not shown sufficient facts to justify the

extraordinary act of exposing Defendants' communications with an attorney who represented them in litigation arising from the dispute at issue in this case.[4]

## V.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id.  This requires the

---

[4] The Court notes that the Declaration contains communications to or in the presence of third-parties that arguably do not constitute privileged confidential communications.  See Sieger v. Zak, 874 N.Y.S.2d 535, 538 (App. Div. 2009) (stating that communications shared with a third party are generally not privileged).  Because Plaintiffs did not raise that issue, nor discuss the relevance of those communications, nor rely on them in opposing Defendants' Motion for Summary Judgment, the Court does not make any further decision as to their admissibility at this time.

nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. Discussion

### 1. Breach of Oral Joint Venture Agreement

In New York,[5] formation of a joint venture requires: (1) two or more persons entered into a specific agreement to carry on an enterprise; (2) the agreement must manifest the intent of the parties to be joint venturers; (3) a contribution by each joint venturer of property, financing, skill, knowledge, or effort to the joint enterprise; (4) some degree of joint control over the enterprise; and (5) a provision for the sharing of profits and losses. N. Shipping Funds I, LLC v. Icon Capital

---

[5] In Defendants' Motion and Plaintiffs' Response, the parties assumed that New York law governed Plaintiffs' claims. However, in their Reply brief, Defendants changed their theory and for the first time asserted that Mexican law governs the question of whether a joint venture agreement was formed. Reply at 1-2.

The Court need not consider issues raised for the first time in a party's reply brief. Shanks v. Village of Catskill Bd. of Trustees, 653 F. Supp. 2d 158, 165 n.6 (N.D.N.Y. 2009) (citing Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993)). Given that the parties otherwise relied on New York law in arguing this motion, they impliedly consented to its application. Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 472 F. Supp. 2d 544, 552 & n.64 (S.D.N.Y. 2007) (applying New York law of joint venture agreements where parties relied on it in their arguments). The Court will therefore apply New York law.

Corp., 921 F. Supp. 2d 94, 102 (S.D.N.Y. 2013); see also Kaufman v. Torkan, 859 N.Y.S.2d 253, 255 (App. Div. 2008).

Defendants argue that there is no evidence of the last element: an agreement to share profits and losses resulting from acquisition of the Property.[6] Mem. at 7-8. Indeed, Plaintiffs themselves state that "*profits and losses were simply not contemplated as being part of this specific joint venture.*" Resp. at 9. An agreement to share profits is unquestionably a requisite element for a joint venture. See Natuzzi v. Rabady, 576 N.Y.S.2d 326, 328 (App. Div. 1991) ("Not every agreement for the joint purchase of real property . . . qualifies as a joint venture. If there was no agreement as to the manner in which profits and losses were to be shared, the agreement between the parties did not create a joint venture . . . ."); see also N. Shipping Funds, 921 F. Supp. 2d at 102 ("For a joint venture to exist, '[i]t is not enough that the parties have agreed to act in concert to achieve some stated economic objective.'" (quoting Abbas Corp. (PVT) Ltd. v. Michael Aziz Oriental Rugs, Inc., 820 F. Supp. 2d 549, 554 (S.D.N.Y. 2011))). Plaintiffs summarize the alleged agreement as one "between two couples to purchase an oceanfront parcel, with each couple contributing 50% of the purchase price, for the ultimate purpose of building a personal vacation home for each." Resp. at

---

[6] Plaintiffs argue that an agreement for the sharing of losses is not necessary to the recognition of a joint venture in this case, because there was no reasonable expectation that the venture would suffer losses. Resp. at 9. They cite a line of decisions implying an agreement to share losses similar to the parties' agreement to share profits where a potential joint venturer stands to lose the value of his start-up capital. Id. (citing Cobblah v. Katende, 713 N.Y.S.2d 723, 724-25 (App. Div. 2000); Penato v. George, 383 N.Y.S.2d 900, 904 (App. Div. 1976); Mariani v. Summers, 52 N.Y.S.2d 750, 754 (Sup. Ct. 1944)). However, another, more recent case cited by Plaintiffs explains that this is a minority rule, and that these decisions "have come under heavy scrutiny and derision . . . for not being in accord with the elements of a joint venture under New York law." Cosy Goose Hellas v. Cosy Goose USA, Ltd., 581 F. Supp. 2d 606, 621 (S.D.N.Y. 2008). Regardless, because Plaintiff has not presented evidence of an agreement to share *profits*, the Court need not delve into this debate.

10. This is not a joint venture agreement. Plaintiffs argue that the parties did not affirmatively

reject the possibility of engaging in profit sharing at "some indefinitie future time," but that fact

does not satisfy the requirement of an agreement to share profits at the time of the joint venture's

formation. See Resp. at 9-10.

Because Plaintiffs have failed to identify any facts as to this necessary element of the joint

venture agreement, Defendants are entitled to judgment as a matter of law on this claim and on the

related claim for rescission of the joint venture agreement.[7]

### 2. Breach of Fiduciary Duty

The Complaint includes a claim for breach of fiduciary duty separate from the joint venture

claim. Compl. ¶¶ 64-69. In moving for summary judgment, Defendants argue that there can be no

fiduciary duty toward Plaintiffs in the absence of the alleged joint venture agreement. Mem. at 10-

11. Plaintiffs counter that aside from the duties owed under the alleged joint venture, Defendants

owed Plaintiffs a fiduciary duty as promoters of the pre-incorporated entity that later became BRJV,

and also because, even in the absence of a formal fiduciary relationship, the special circumstances of

the parties' relationship created fiduciary duties. Resp. at 14-15.

"It is well settled that both before and after a corporation comes into existence, its promoter

acts as the fiduciary of that corporation and its present and anticipated shareholders." Roni LLC v.

Arfa, 903 N.Y.S.2d 352, 355 (App. Div. 2010), aff'd, 963 N.E.2d 123 (N.Y. 2011). This duty

"includes the obligation to disclose fully any interests of the promoter that might affect the company

---

[7] Count IX of the Complaint requests a judgment declaring the rights and interests of the
parties to the joint venture agreement. Compl. ¶ 119. Because the Motion is denied as to Plaintiffs'
other claims, the Court may grant appropriate declaratory relief at a later time in its discretion. See
28 U.S.C. § 2201(a).

and its members, including profits that the promoter makes from organizing the company." Id. Concealing the true price of an asset that the corporation is formed to acquire likewise breaches the duty. See Brewster v. Hatch, 25 N.E. 505, 508 (N.Y. 1890). Plaintiffs have presented evidence from which a reasonable factfinder could determine that Defendants were promoters of BRJV and breached the fiduciary duty they owed Plaintiffs in that capacity. Plaintiffs wired $135,000, which they claim was to be used for half the total purchase price of the Property, but the total purchase price was only $163,500. SMF Resp. ¶ 8; Dkt. No. 15-3, Ex. A. Whether Defendants secretly pocketed an "entry fee" or concealed the true price of the Property is a disputed issue of fact. SMF ¶ 8; SMF Resp. ¶¶ 8-9; Reply Decl. ¶ 5.

Additionally, a fiduciary relationship can be informal, and "exists when confidence is reposed on one side and there is resulting superiority and influence on the other." Roni, 963 N.E.2d at 125-26; see also Apple Records, Inc. v. Capitol Records, Inc., 529 N.Y.S.2d 279, 283 (App. Div. 1988). Fiduciary duties "can attach to 'those informal relations which exist whenever one man trusts in, and relies upon, another' as, for example, 'in appropriate circumstances between close friends.'" Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 770, on reargument, 742 F. Supp. 786 (S.D.N.Y. 1990) (quoting Penato, 383 N.Y.S.2d at 904-05). Whether a fiduciary relationship exists is a question of fact, and conflicting evidence as to its existence will preclude a motion for summary judgment. Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., No. 88-cv-819, 1992 WL 121726, at *21 & n.34 (N.D.N.Y. May 23, 1992) (collecting cases); see also Roni, 939 N.Y.S.2d at 748 ("Ascertaining the existence of a fiduciary relationship inevitably requires a fact-specific inquiry.") (quotation marks omitted).

A reasonable factfinder could determine that a relationship of trust and confidence arose between the parties. Plaintiffs have presented evidence of an ongoing social relationship before and after the acquisition of the Property and the formation of BRJV. SMF Resp. ¶ 1; Nuss Dep. at 150-51; Dkt. No. 15-4. And one can infer from the evidence presented that Plaintiffs trusted the integrity of Defendants in wiring them $135,000, and relied on them in the acquisition of the Property and the formation of BRJV. SMF Resp. ¶¶ 1-2, 5-6. Whether a fiduciary relationship existed, and whether the Defendants betrayed the confidence that Plaintiffs reposed in them, are facts to be decided at trial. Accordingly, Plaintiffs have met their burden of presenting a disputed issue of material fact as to their claim for breach of fiduciary duty, and summary judgment is denied.

### 3. Accounting

The Complaint includes a claim for an accounting of the funds Plaintiffs entrusted to Defendants. Compl. ¶ 70-76. "Under New York law, an accounting is a distinct cause of action rooted in equity." Sang Lan v. Time Warner, Inc., 11-cv-2870, 2013 WL 1703584, at *10 (S.D.N.Y. Apr. 19, 2013). An action for accounting seeks an adjustment of the accounts of the parties and a judgment for the balance due. Id. The elements for an accounting are: (1) a fiduciary or confidential relationship; (2) the entrustment of money or property to the defendant; (3) the absence of an adequate remedy at law; and (4) in some cases, a demand for an accounting and a refusal. Id.

Defendants move for summary judgment based on the alleged non-existence of the requisite fiduciary relationship[8] and because Plaintiffs have not provided evidence of Defendants's failure or refusal to provide an accounting. Mem. at 11-13. Plaintiffs respond that a demand for an

---

[8] As discussed *supra*, whether a fiduciary duty existed remains a disputed question of fact.

accounting would have been futile, and so failure to plead such a demand does not preclude this cause of action. Resp. at 17.

A demand need not be formal, and the requirement may be excused where the record makes clear that a demand would have been futile. See Kaufman v. Cohen, 760 N.Y.S.2d 157, 168-69 (App. Div 2003) (affirming that informal demands are sufficient to state a claim for accounting); Non-Linear Trading Co. v. Braddis Assocs., 675 N.Y.S.2d 5, 9, 13-14 (N.Y.App. Div. 1998) (finding verbal demand sufficient); Conroy v. Cadillac Fairview Shopping Ctr. Props., Inc., 533 N.Y.S.2d 446, 447 (N.Y.App. Div. 1988) (finding demand for and refusal of "true and full information" about financial affairs was sufficient); Zulawski v. Taylor, 815 N.Y.S.2d 496, 2005 WL 3823584, at *10 (N.Y. Sup. Ct. 2005) (finding demand futile where plaintiff was expelled from company and defendant denied that plaintiff was entitled to any relief). The record provides ample evidence of the acrimonious nature of the parties' relationship, including litigation in Mexico and the dilution of Plaintiffs' ownership of and control over BRJV. SMF ¶¶ 17-18; SMF Resp. ¶ 18; Reply Decl. ¶¶ 12-13. Furthermore, Plaintiffs point to evidence suggesting that BRJV's corporate accounting records are insufficient for a proper accounting through traditional corporate means. Resp. at 17; Dkt. No. 83-1 ("V. Sabad Deposition") at 101-17. On these facts, a jury could find that a demand for an accounting would have been futile, and so Defendants are not entitled to summary judgment.

### 4. Constructive Trust

"Under New York law, the elements of a constructive trust are: '(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.'" N. Shipping Funds, 921 F. Supp. at 106 (quoting In re Ades

and Berg Group Investors, 550 F.3d 240, 245 (2d Cir. 2008)).  Defendants argue that they are entitled to summary judgment in their favor on this claim because Plaintiffs cannot prove the existence of a joint venture that would give rise to a fiduciary relationship.  However, as discussed *supra*, there is a disputed fact issue as to the existence of a fiduciary relationship even in the absence of a joint venture.  Accordingly, Defendants' Motion is denied as to the claim for a constructive trust.

### 5. *Fraudulent Misrepresentation*

The Complaint includes a claim for fraudulent misrepresentation based on Defendants' allegedly false statements regarding the purchase of the Property and the formation of BRJV.  Compl. ¶¶ 95-100.  "To prevail on a fraud claim under New York law, a plaintiff must establish five elements by clear and convincing evidence: 1) the defendant made a material misrepresentation; 2) the defendant knew of its falsity; 3) the defendant possessed an intent to defraud; 4) the plaintiff reasonably relied on the misrepresentation; and 5) the plaintiff suffered damage as a result of the misrepresentation."  Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000).  Defendants challenge the sufficiency of the evidence as to each element.[9]  Mem. at 16-19.

---

[9] In their Motion, Defendants also argue that the fraud claim fails as a matter of law because it is "duplicative of their cause of action for breach of the oral joint venture agreement."  Mem. at 19-20.  Defendants do not discuss whether the separate claim for breach of fiduciary duty would likewise preclude a fraud claim, see Calabro v. Fleishell, 851 N.Y.S.2d 155, 156 (App. Div. 2008) ("A claim for fraud cannot duplicate a claim for breach of fiduciary duty.").  Nevertheless, the Court notes that because the existence of an informal fiduciary relationship remains a disputed question of fact, summary judgment on otherwise valid claims simply because they rely on overlapping facts would be inappropriate.

### a. Material Misrepresentation

Defendants argue that even if they misrepresented the sum of $135,000 as equal to 50% of the land's purchase price (plus related transaction expenses), that misrepresentation was not material in light of the other costs associated with acquiring the property. Mem. at 16-17. In other words, Plaintiffs would have paid the $135,000 whether it was earmarked for half of the total land price or for half of the total land price plus other costs.

Under New York Law, the question of whether a statement was material presents a question of fact for the jury. Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 45 (2d Cir. 1991). Although the fact-specific nature of this determination precludes most generalizations, where a misrepresentation influences a plaintiff's decision to go through with a transaction, it is material. See Roni, 903 N.Y.S.2d at 356.

Here, the parties dispute the purpose of the $135,000 payment and what was given in consideration. The $135,000 transfer has variously been described in the record as (1) funds "to be used for property acquisition costs, related transaction costs and 'common element improvements;'" (2) a payment "to cover [Plaintiffs'] half of the purchase price and related expenses," which totaled $270,000; and (3) a fee for the right to invest in a lucrative real estate opportunity. SMF ¶ 8; SMF Resp. ¶ 8; Reply Decl. ¶ 5; see also Resp. at 20-21. Whether Plaintiffs would have acted differently had they known the true price of the land depends on their understanding of the payment's purpose, and therefore remains a disputed issue of fact.

### b. Knowledge of Falsity

Defendants also argue that there is no evidence that Defendants themselves knew that $135,000 was greater than half the purchase price of the land plus associated costs. Mem. at 17.

Because the total cost of "related transaction expenses and constructing infrastructure" was not and could not have been determined until after the purchase, Defendants could not have known the truth or falsity of that representation. Mem. at 17.

This argument does not respond to Plaintiffs' allegation that Defendants knowingly misrepresented the purchase price of the land itself. Resp. at 22. Whether the $135,000 was represented by Defendants as going directly to the land, to transaction expenses, to infrastructure, or as simply an entry fee payment to Defendants, is precisely the fact question presented by the record. SMF ¶ 8; SMF Resp. ¶ 8; Reply Decl. ¶ 5. see also Resp. at 20-21. Because the nature of the representation made by Defendants to Plaintiffs is a disputed factual issue, the Court cannot determine whether that representation was false and, if so, whether Defendants knew it was false. These are facts to be determined at trial.

### c. Intent to Defraud

Defendants argue that the record is "simply devoid of any evidence . . . that Defendants intended to defraud Plaintiffs before or after the parties formed the corporation to purchase the property in Mexico." Mem. at 17-18. On the contrary, based on the conflicting testimony of the parties' as to the purpose of the $135,000 payment, as well as the documentary evidence of the flow of funds, a reasonable factfinder could conclude that Defendants intended to defraud Plaintiffs by misrepresenting the purchase price. SMF ¶ 8; SMF Resp. ¶ 8; Reply Decl. ¶ 5; Dkt. No. 15-3, Ex. A.

Defendants also suggest that, because Plaintiffs were on an "equal footing" with them in terms of Spanish language competency and interactions with the drafting attorney Lomeli, a factfinder could not infer fraudulent intent from the inclusion of erroneous provisions in the BRJV

26

Constitution. This argument misses the mark in two ways. First, even if there was no fraudulent misrepresentation as to the BRJV documents, Defendants may still be liable for the alleged misrepresentation of the purchase price of the land. Second, the circumstances of the drafting of the BRJV documents are disputed, and what conclusions as to Defendants' intent can be drawn from the allegedly erroneous provisions—i.e. whether they were the result of fraud or mere mistake, and whether Defendants had a role in inserting them—is a question for trial. SMF ¶ 5; SMF Resp. ¶ 5; Reply Decl. ¶¶ 3, 5-8. See Gelb v. Bd. of Elections, 224 F.3d 149, 157 (2d Cir. 2000) (finding summary judgment inappropriate where defendant's state of mind in question).

### d. Reasonable Reliance

Defendants also argue that, as to the execution of the BRJV documents, Plaintiffs have not shown that they reasonably relied on any misrepresentation. See Mem. at 18. Specifically, Defendants assert that "Plaintiffs cannot show 'excusable ignorance' because, if Plaintiffs truly did not understand the documents they were signing and what was happening when the parties were forming the corporation, they could and should have hired their own attorney in Mexico . . . ." Id. However, given their ignorance of the Spanish language, Plaintiffs' failure to examine the contract can be excused if there was in fact a material misrepresentation by Defendants with intent to defraud. See Vihart v. Broadway Development Corp., 188 N.Y.S. 475-76 (App. Div. 1921) (finding failure to examine English-language contract did not preclude fraud claim where defendant made false representations about contract's terms to purchasers ignorant of English language).

Furthermore, reasonable reliance does not require an independent inquiry by a plaintiff where reliance is based on a fiduciary relationship and the plaintiff has no reason to question the fiduciary's representations. See Frame v. Maynard, 922 N.Y.S.2d 48, 51 (App. Div. 2011);

Koncelik v. Abady, 578 N.Y.S.2d 717, 718 (App. Div. 1992). Accordingly, if Plaintiffs can show at trial that a fiduciary relationship existed, and that they relied on this relationship in assenting to the formation of BJRV, their failure to hire their own attorney or otherwise investigate the BRJV documents will not render their reliance on Defendants unreasonable. See supra Part V.B.2.

e. Damages

"Under New York law, the basic measure of damages for fraud is the actual pecuniary loss sustained as a result thereof." Wood v. Maguire Auto. LLC, 09-cv-0640, 2011 WL 4478485, at *9 (N.D.N.Y. Sept. 26, 2011), aff'd, 508 F. App'x 65 (2d Cir. 2013). This damages measure is also known as the "out-of-pocket rule." Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1373 (N.Y. 1996). "Under this rule, the loss is computed by ascertaining the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." Id. "Moreover, consequential damages can be recovered provided that they naturally flow from the fraud and recovery is limited to that necessary to restore the plaintiff to the position occupied before the commission of the fraud." Wood, 2011 WL 4478485, at *9.

Defendants contend that Plaintiffs cannot prove they suffered any damages, and offer at least three supporting arguments: (1) "even if Defendants misrepresented the $135,000 as equal to 50% of the purchase price of the property, there were numerous other costs associated with forming the corporation and purchasing the property, many of which came directly out of Defendants' own pocket;" (2) Plaintiffs constructed a house on their half of the parcel and were living there as early as January 8, 2007; and (3) "the value of [Plaintiffs'] investment, namely ocean-side beachfront

28

vacation property, is just as likely to have increased to an amount in excess of any alleged damages." Mem. at 19.

Contrary to Defendants' assertions, Plaintiffs have presented evidence of damages. First, as stated previously, the nature of the $135,000 is very much in dispute. See supra Part V.B.5.a. Based on Plaintiffs' version of the facts, they paid $135,000 for an interest in land that was worth less than $135,000. SMF Resp. ¶ 6. Under the out of pocket rule, they would be entitled to the difference. Second, even if Plaintiffs did successfully construct their house and begin living there, the record contains testimony as to alleged harassment and interference with Plaintiffs' use of the property as a vacation home, which could be enough to show pecuniary loss if using the land for building and living in a vacation home was the bargain for which Plaintiffs paid consideration. SMF Resp. ¶ 18. Third, the current value of the Property is a matter of speculation, and the Defendants have not identified any portion of the record to support their assertion that the investment has increased in value. Mem. at 19. More importantly, however, the record contains evidence that Plaintiffs cannot profit from any such increase in value because their interest in BRJV was drastically diluted by Defendants. SMF Resp. at 10-11; Reply Decl. ¶¶ 12-13. Finally, based on Plaintiff Barbara Nuss's testimony as to the hundreds of thousands of dollars she has expended in legal fees as a result of this dispute, Plaintiffs may be entitled to significant consequential damages that would restore them to the position they would have been in absent the fraud. See Nuss Dep. at 130-31. Accordingly, whether Plaintiffs suffered damages from any misrepresentations remains genuinely disputed.

Because there are genuine issues of disputed fact as to each element of fraudulent representation, Defendants' Motion as to this claim is denied.

*6. Conversion*

"Conversion is the unauthorized exercise of dominion or control over specifically identified property which interferes with the owner's rights." <u>Hoffman v. Unterberg</u>, 780 N.Y.S.2d 617, 619 (App. Div. 2004) <u>abrogated on other grounds by</u> <u>Tzolis v. Wolff</u>, 884 N.E.2d 1005 (N.Y. 2008). "When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion." <u>Id.</u>

Defendants assert that no evidence in the record supports Plaintiffs' claim that they used funds for an unauthorized purpose. Mem. at 21. But the authorized purpose of the $135,000 wire transfer is itself a matter of dispute. SMF ¶ 8; SMF Resp. ¶ 8; Reply Decl. ¶ 5. <u>see also</u> Resp. at 20-21. Plaintiffs have presented evidence from which a reasonable factfinder could conclude that the funds were provided to pay half the purchase price of a specific property, and that Defendants used part or all of those funds for another purpose. <u>See</u> SMF ¶ 5; SMF Resp. ¶ 5; Reply Decl. ¶¶ 3, 5-8. Accordingly, the Motion is denied as to the conversion claim.[10]

*7. Unjust Enrichment*

"In order to prevail on a theory of unjust enrichment, the plaintiff must demonstrate that (a) the defendant has been enriched; (b) the enrichment was at the plaintiff's expense; and (c) defendant's retention of the benefit would be unjust." <u>Startech, Inc. v. VSA Arts</u>, 126 F. Supp. 2d 234, 237 (S.D.N.Y. 2000). "[T]o determine whether there has indeed been unjust enrichment the inquiry must focus on the 'human setting involved,' not merely upon the transaction in isolation." <u>Mayer v. Bishop</u>, 551 N.Y.S.2d 673, 675 (App. Div. 1990) (quoting <u>McGrath v. Hilding</u>, 363

---

[10] Defendants argue alternatively that the conversion claim is duplicative of the claim for breach of the joint venture agreement. Mem. at 21-23. Because the joint venture claim is dismissed, the Court need not consider whether the conversion claim would be duplicative.

N.E.2d 328, 331 (N.Y. 1977)) (citation omitted). "[I]t is not a prerequisite of an unjust enrichment claim that the one enriched commit a wrongful or unlawful act." Mayer, 551 N.Y.S.2d at 675.

Defendants assert that there is "no evidence" that they received "any extra benefit" from the parties' contributions to BRJV. Mem. at 23. However, the record contains evidence that Defendants received a 50% ownership stake in the Property despite contributing only 17.5% of its purchase price, and that Defendants now control the land on which Plaintiffs built a vacation house at their own expense. A reasonable factfinder could conclude: (1) that Defendants were enriched by Plaintiffs' contribution to the acquisition of the Property, and by the later construction of Plaintiffs' house; (2) that the enrichment was at Plaintiffs' expense; and (3) that Defendants' retention of these benefits would be unjust. SMF Resp. ¶ 9; SMF ¶ 14; Resp. at 23-24. Accordingly, summary judgment is denied as to the claim for unjust enrichment.[11]

## VI.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 50) for summary judgment is **GRANTED in part** and **DENIED in part** consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Plaintiff's claims for breach of the oral joint venture agreement and rescission of the oral joint venture agreement are **DISMISSED**; and it is further

---

[11] Defendants argue that the BRJV constitution is a valid contract covering this dispute, and that it therefore precludes a claim for unjust enrichment. Mem. at 24 (citing Clark-Fitzpatrick, Inc. v. Long Island R.R., 516 N.E.2d 190, 193 (N.Y. 1987)). Defendants have not established that the unjust enrichment claim falls entirely within that document's scope, and so have not shown that they are entitled to judgment as a matter of law on this basis.

31

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      September 30, 2013
               Albany, NY

               Lawrence E. Kahn
               U.S. District Judge