UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BARBARA NUSS, Individually and as
Executor of the Estate of Robert A. Nuss,

                Plaintiff,

     -against-                           7:10-CV-0279 (LEK/TWD)

JOSEPH WILLIAM SABAD, *et al.*,

                Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

This case—a dispute concerning Mexican real estate between Plaintiff Barbara Nuss and

Defendants Joseph and Vicki Sabad—has been before the Court for over six years. After

significant motion practice and discovery, the parties agreed to resolve their claims out of court.

Dkt. No. 143 ("Settlement Notice"). However, just shy of one year after the settlement was

announced, the parties claimed they arrived at another impasse. The case was restored to the

Court's calendar, Dkt. No. 160 ("Reopening Order"), reviving a summary judgment motion filed

before the settlement was first announced and also spurring a new filing based on the impasse

itself.

Presently before the Court are two motions: the Sabads' second Motion for Summary

Judgment, Dkt. No. 139 ("Summary Judgment Motion"), and Nuss's Motion to Enforce

Settlement Agreement and for Sanctions, Dkt. No. 166 ("Settlement Motion"). For the reasons

stated below, both the Settlement Motion and the Summary Judgment Motion are denied.

## II.    BACKGROUND

### A.  The Underlying Dispute

The facts of this case—a story of beachfront betrayal on the western shores of

Mexico—are largely outlined in the Court's previous summary judgment opinion, Nuss v. Sabad,

976 F. Supp. 2d 231 (N.D.N.Y. 2013) (Kahn, J.), as well as the parties' statements of material

facts, Dkt. Nos. 139-10 ("Defendants' SMF"), 174 ("Plaintiff's SMF").[1] The parties, along with

Nuss's late husband Robert Nuss, first met in late 2002 or early 2003; shortly thereafter, they set

out to acquire real estate together in Mexico. Nuss, 976 F. Supp. 2d at 237; Defs.' SMF ¶¶ 1–2.

At the time, "the parties' stated intentions were to use the property to construct private vacation

homes," and "[t]hey planned to share the expenses of buying, developing, and maintaining the

land on a 'dollar-for-dollar basis.'" Nuss, 976 F. Supp. 2d at 237–38.

Having decided to purchase a particular piece of property in Cihuatlán, a municipality in

the Mexican state of Jalisco, the Nusses wire transferred $135,000 to the Sabads' New York

bank account on March 26, 2003, in order to fund their share of the transaction. Defs.' SMF

¶¶ 4–5. One day later, the Sabads established a Mexican Corporation named B.R.J.V., S.A. de

C.V. ("BRJV")—presumably named after the first initials of the Nusses and the Sabads—to take

title to the property. Id. ¶¶ 6–7. Each of the Nusses and the Sabads received a 25% ownership

---

[1]  In several of the responses to the Sabads' Statement of Material Facts, Nuss admits to several facts "only to the extent [they were] so framed" in other documents, but "otherwise" denies them. E.g., Pl.'s SMF pt. II, ¶ 1. This type of response fails to comport with the requirements of the Local Rules, which specify that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3). As such, and pursuant to the Local Rules, the Court deems these facts to have been admitted in deciding the Summary Judgment Motion. See id. ("The Court shall deem admitted any properly supported facts . . . that the opposing party does not specifically controvert." (emphasis omitted)).

interest in BRJV, such that each couple owned half of the company. Defs.' SMF ¶ 9; Pl.'s SMF pt. II, ¶ 9. On April 2, 2003, Joseph Sabad transferred a large sum of money, including the Nuss's $135,000,[2] from the couple's New York account to another account located in Mexico. Defs.' SMF ¶ 10. What follows next is the core of the parties' dispute: an honest transaction according to the Sabads, but treachery according to Nuss.

On the same day that Joseph Sabad transferred the funds to the Sabads' Mexican account, he drew a check for approximately $165,000 to pay the seller of the land. Id. ¶ 10.[3] While the Sabads' description does not discuss this further, Nuss cries foul on this part of the deal: since the $135,000 the Nusses paid up was far more than half of the property's purchase price, this seems to violate the parties' agreement to "share the expenses of buying . . . the land on a 'dollar-for-dollar basis.'" Nuss, 976 F. Supp. 2d at 237–38; see also Compl. ¶ 8 ("The central feature of Sabad's proposed joint venture, to which [the Nusses] agreed, was that the Nusses would furnish 50 percent of the funds needed to purchase the property and that [the Sabads] would furnish the other 50 percent."). According to Nuss, the Sabads "never put up funds to match the $135,000 wired by [the Nusses]." Pl.'s SMF pt. II, ¶ 12.

---

[2] Vicki Sabad objects to the description of this money as belonging to the Nusses, claiming that after the funds were transferred to the Sabads, they belonged in full to them. See Dkt. No. 83-1 ("V. Sabad Deposition") at 245:24–246:9 ("A. . . . but that was after the corporation was formed and the money was ours. Q. My clients' money in your bank account was your money? A. Yes, it was. . . . MR. LENNEY [the Sabads' counsel]: Vicki, please quit volunteering . . . .").

[3] While the Sabads' motion papers list this amount as approximately $165,500, Defs.' SMF ¶ 11, the Complaint (which the Sabads cite to for this point) and the Court's previous opinion both refer to this amount as approximately $163,500, Dkt. No. 1 ("Complaint") ¶ 18; Nuss, 976 F. Supp. 2d at 238. The precise dollar amount is irrelevant to the currently pending motions in this case.

In the years following the purchase of the land, the parties and BRJV engaged in various improvement and construction projects on the land. These included infrastructure necessities such as roads, power lines, and septic systems, along with various small structures (namely, a guard house and palapa hut). Nuss, 976 F. Supp. 2d at 239; Defs.' SMF ¶¶ 14–18; Pl.'s SMF pt. II, ¶ 14–18. According to Nuss, she and her husband provided additional funds to pay for some of these infrastructure projects on top of the money paid for the purchase of the land. Pl.'s SMF pt. II, ¶ 15. As alleged by Nuss, the property was divided into two parcels—one for each family to build a residence on, Compl. ¶ 32—though BRJV maintained full title to the land, see Defs.' SMF ¶ 12; Pl.'s SMF pt. II, ¶ 12. The Nusses constructed a single-family residence on their parcel, which was used as their residence when they visited the property. Defs.' SMF ¶ 19.

The first crack in the Nusses' perception of the Sabads and BRJV apparently came in January 2007, when the Sabads proposed subdividing the property and developing it for condominiums at a BRJV shareholder meeting. Id. ¶ 23. The Nusses opposed this idea, adjourned the meeting, "and promptly hired lawyers to investigate BRJV and the Nusses' dealings with the Sabads." Id. ¶ 24. In either March or April of 2007 (approximately three years before this lawsuit was filed), the Nusses discovered that the purchase price of the property was far less than they believed, and thus that their $135,000 payment covered considerably more than half of the cost. Id. ¶ 25.

Though the story told by the Sabads' motion papers ends with the Nusses' discovery of the property's true purchase price, Nuss makes several additional allegations in her response. The most important of these for deciding the motions before the Court concerns a September 18, 2007 shareholder meeting of BRJV. Pl.'s SMF pt. III, ¶ 4. At that meeting, for which the Nusses

were not present, the Sabads issued themselves five thousand additional shares each, reducing the

Nusses' collective ownership of BRJV from their original 50% stake to just 4.5%. See id.

According to Nuss, the only notice provided for the meeting was publication in a local Spanish-

language newspaper (the Nusses do not speak Spanish)—a departure from the previous practice

of the Sabads to notify them personally of BRJV shareholder meetings. Id. ¶ 7. On March 3,

2010—about two and one-half years after this meeting—Nuss filed her Complaint with the Court

on behalf of herself and the estate of her late husband. Compl.

**B. The Settlement Agreement**

After significant discovery and other motion practice in this case, the Sabads filed their

second motion for summary judgment on July 2, 2014, arguing that the majority of Nuss's claims

either are barred by the statute of limitations or are duplicative. Dkt. No. 139-16 ("Summary

Judgment Memorandum"). This motion was never decided. Shortly after the Summary Judgment

Motion was filed, a settlement conference was held before U.S. Magistrate Judge Thérèse Wiley

Dancks. See Dkt. No. 138. While the parties were unable to settle at the time of the conference,

Nuss's counsel notified the Court on August 26, 2014, that a settlement had been reached, and

that the parties "intend[ed] to discontinue the litigation and prepare a mutually acceptable

settlement agreement." Settlement Notice at 1. That same day, the Court entered a judgment

conditionally dismissing the case. Dkt. No. 144 ("Conditional Judgment"). The judgment

provided that either party could, within 120 days, reopen the case by filing a motion informing

the Court that "the settlement was not consummated." Id.

On December 9, 2014, a settlement agreement among the parties was fully executed. Dkt.

No. 166-1 ("Gonzalez Declaration") Ex. 1, at 9–10. The agreement included several "essential

terms," a cash payment, and a provision for discontinuing this litigation. Id. at 1–4. Two of the

essential terms are relevant to the Court's decision today and were prerequisites for Nuss to file a

stipulation of dismissal. Id. at 4. The first is the legal division of the property disputed in this

case "into two essentially equal-sized, adjacent parcels," a task that the Sabads and BRJV were

responsible for. Id. at 2, 4, 12. The second is Nuss's discontinuation of any Mexican legal

proceedings she initiated against the Sabads concerning this case. Id. at 2–4, 12. The most

important of these Mexican proceedings for the present motion is a "precautionary lien" that

serves to prevent third-party sale or transfer of the property. Dkt. No. 166-2 ("Settlement

Memorandum") at 2–3.

      The agreement defines its "Effective Date" as the "date of Completion of all of the

Essential Terms, except for Payment." Gonzalez Decl. Ex. 1, at 2 (emphasis omitted). The

possibility of these essential terms not being met, and thus the Effective Date never being

reached, is considered in two portions of the agreement. First, in describing an escrow

arrangement, the agreement provides as follows:

> [I]n recognition of the fact that the Essential Terms contemplate
> further agreements between the parties necessary to implement the
> purposes of this Agreement and the approvals by public authorities
> governed by Local Law, it is possible that the Effective Date will not
> be reached by the original Dismissal Date [in the Court's Conditional
> Judgment], or potentially anytime thereafter. . . . If the Effective Date
> is not reached, including any mutually agreed extensions, the Nusses
> shall have no claim to or interest in the escrow fund.

Id. at 3 (emphasis omitted).

Second, when discussing the stipulation of discontinuance to be filed by Nuss, the agreement alludes to the possibility of a future impasse and the parties' intentions to "preserve the Lawsuit" before this Court:

> In the event that notice of the Land Division and the Certification [of discontinuance of the Mexican legal proceedings] have not been delivered on or before December 12, 2014, and the parties then agreeing that impasse has not been reached, the parties shall file a joint stipulation in support of a written motion seeking an Order of the Court extending the Dismissal Date, it being the joint intent of the parties to seek such additional time as is reasonably necessary to complete the Essential Terms and to preserve the Lawsuit until all Essential Terms are Completed. In the event that the Court denies any motion to extend the Dismissal Date, any party may notify the Court and the opposing party of an intention to proceed with the Lawsuit.

Id. at 4.

In line with this provision, the parties filed six motions for extension of the dismissal deadline in the Court's Conditional Judgment. Dkt. Nos. 145, 147, 149, 151, 154, 156. All of these extension requests were granted. Dkt. Nos. 146, 148, 150, 153, 155, 157.

### C. The Impasse and Present Motions

During the course of these numerous extensions, an impasse began to build among the parties. According to Nuss, the problem stemmed from the Sabads' refusal to subdivide the property as required by the settlement agreement. See Settlement Mem. at 2–6. While the Sabads were waiting to divide the property until Nuss discontinued the Mexican legal proceedings and lifted the precautionary lien on the property, Nuss argued that this went against the text and spirit of the settlement agreement. Id. at 5–6. This is because the settlement agreement lists the subdivision of the property first on the list of essential terms and the discontinuance of Mexican legal proceedings sixth (implying that the subdivision should occur first), and because lifting the

7

lien before the property is subdivided and placed into escrow would surrender Nuss's only leverage in the deal, allowing the Sabads to sell or otherwise dispose of the property without upholding their end of the bargain. See id. at 2–6.

The Sabads obviously had a different view of the settlement agreement. First, the Sabads argue that release of the precautionary lien "is legally required to complete any transaction involving the Property," including the agreed-upon subdivision of the property. Dkt. No. 177-7 ("Settlement Opposition") at 3, 11–12. The Sabads therefore claim that Nuss put them in a catch-22: Nuss will not release the lien until the Sabads subdivide the property, but the property cannot be subdivided until Nuss releases the lien. Second, the Sabads also argue that Nuss breached the clear terms of the settlement agreement, which required that "all parties, including their Mexican legal representatives, undertake in good faith to *immediately* take steps to cause the Mexican Legal Proceedings to be Terminated." Gonzalez Decl. Ex. 1, at 4 (emphasis added); see also Settlement Opp'n at 2, 9–12. Finally, the Sabads note that the list of essential terms "is not stated to be in any particular order," and that the settlement agreement does not "provide or require any order to accomplish those items." Settlement Opp'n at 2.

While the parties' attorneys made various compromise proposals, see Settlement Mem. at 3–5, 9–10; Settlement Opp'n at 3–4, the dispute regarding this issue was never resolved. As such, in July 2015, both parties filed letter motions requesting that the case be reopened and restored to the Court's active calendar. Dkt. Nos. 158, 159. After the parties' requests were granted and the case was returned to active status, Dkt. No. 160, so too was the Sabads' Summary Judgment Motion, see Dkt. Nos. 161, 163 (setting revised briefing schedules for the Summary Judgment Motion).

When the Court was awaiting a response to the year-old Summary Judgment Motion, on November 25, 2015, Nuss also filed her Settlement Motion, seeking an order "enforcing the settlement agreement" and "requiring [the Sabads] to comply with the implementation of the Settlement Agreement entered into between the parties." Settlement Mot. at 2.[4] The Sabads responded, arguing that Nuss was the one who breached the agreement, and that in either case the Court lacked jurisdiction to enforce the settlement agreement. Settlement Opp'n.

## III.  MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

### A.  Jurisdiction to Enforce the Settlement Agreement

Before reaching the merits of Nuss's Settlement Motion, the Court must address the Sabads' argument that it lacks jurisdiction to enforce the settlement agreement. As the Sabads note, "[a] federal court does not automatically retain jurisdiction to hear a motion to enforce or otherwise apply a settlement in a case that it has previously dismissed." Id. at 4 (quoting StreetEasy, Inc. v. Chertok, 752 F.3d 298, 304–05 (2d Cir. 2014)). This is undoubtedly true, but this case was not "previously dismissed," as the Court's Conditional Judgment was withdrawn when the case was restored to the active calendar.

While most case law in this area appears to concern whether a mid-litigation oral agreement of settlement is binding on the parties and enforceable by the courts, one of our sister districts—in a case affirmed by the Second Circuit—provides some insight as to when a district court can enforce a settlement agreement in an active lawsuit:

---

[4]  Neither the Settlement Motion nor Nuss's brief provides a specific request for what the Sabads should be ordered to do, though it seems clear that Nuss at least desires an order requiring that the Sabads divide the property. See Settlement Mem. at 18 ("The Court should . . . compel the Sabads without further ado to undertake—in the correct order—the terms of the Settlement Agreement, and to act in accordance with it as a willing party should.").

One cannot dispute that the court retains jurisdiction, prior to the dismissal of the case, to enforce a settlement agreement in a case over which it presided. As the Second Circuit remarked, "[a] court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings." This authority is "not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes." It "has its basis in the policy favoring the settlement of disputes and the avoidance of costs and time-consuming trials."

Omega Eng'g, Inc. v. Omega, SA, No. 98-CV-2462, 2004 WL 2191588, at *4 (D. Conn. Aug. 12, 2004) (citations omitted) (quoting Janus Films, Inc. v. Miller, 801 F.2d 578, 583 (2d Cir. 1986); Brown v. Nationscredit Commercial, No. 99-CV-592, 2000 WL 888507, at *1 (D. Conn. June 23, 2000)), aff'd, 432 F.3d 437 (2d Cir. 2005). In affirming the district court's decision in Omega, the Second Circuit importantly added that "[a] trial court has inherent power to enforce summarily a settlement agreement when the terms of the agreement are 'clear and unambiguous.'" 432 F.3d at 444.

In this case, the settlement agreement was reported to the court following a settlement conference before Judge Dancks, and the Court entered its Conditional Judgment to facilitate the parties' agreement. Furthermore, enforcement of an unambiguous and straight-forward settlement agreement would promote the efficient use of judicial resources and "preserve the integrity of [the] settlement" as a reasonable means to resolve this dispute. Omega, 2004 WL 2191588, at *4 (quoting Brown, 2000 WL 888507, at *1). As such, the Court does retain jurisdiction to enforce the settlement agreement, so long as the terms of settlement agreement are "clear and unambiguous" and amenable to summary enforcement by entry of a judgment in this case. See Omega, 432 F.3d at 444; see also Janus Films, 801 F.2d at 583 ("Agreements that end

lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. . . . Even if the settlement agreement does not include a completely drafted consent judgment, a court is not obliged to place a trial on hold, to be resumed if the parties fail to agree on the precise wording of a judgment.").

The Sabads also suggest that the settlement agreement's forum selection clause requires that any attempt to enforce the agreement be brought in courts outside of New York. Specifically, that provision states as follows:

> In the event of a dispute under this Agreement, the parties agree that if the Sabads are the breaching party, an action may be commenced in the State of California and if the Nusses are the breaching party, an action may be commenced in the State of Oregon. Each party to this Agreement consents to venue as described in this paragraph . . . .

Gonzalez Decl. Ex. 1, at 7. Most importantly, this provision states that actions "may" be commenced in either California or Oregon, depending upon the breaching party.

The four-step determination governing the enforceability of forum-selection clauses is well settled in this circuit. See, e.g., Phillips v. Audio Active Ltd., 494 F.3d 378, 383–84 (2d Cir. 2007). The second of these steps asks courts "to classify the clause as mandatory or permissive, i.e., to decide whether the parties are *required* to bring any dispute to the designated forum or simply *permitted* to do so." Id. at 383. It is similarly well settled that the use of the word "may" when designating permissible fora as locations where actions "may be brought" (or, as in this case, "may be commenced") makes that forum selection clause permissive and not mandatory. Id. at 387; Blanco v. Banco Indus. de Venez., S.A., 997 F.2d 974, 979 (2d Cir. 1993). Accordingly, the settlement agreement's forum selection clause does not prevent this Court from entertaining a motion for that agreement's summary enforcement.

**B. Terms of the Settlement Agreement**

As discussed above, the Court has jurisdiction to enforce the settlement agreement insofar as a breach of that agreement can be summarily remedied by entry of a judgment in this case. After reviewing the agreement, however, the Court finds that the terms of the settlement agreement are not amenable to summary enforcement by the entry of judgment or otherwise. As such, Nuss's motion to enforce that agreement must be denied.

Turning first to the text of the agreement, the terms seem to contemplate (though admittedly without the utmost clarity) the possibility of an impasse similar to the one experienced by the parties in this case. When moving for an extension of the dismissal deadline set by the Conditional Judgment, the parties are required to "agree[] that impasse has not been reached" in order for the case not to be restored to active litigation. Gonzalez Decl. Ex. 1, at 4. Another section of the agreement implies that a final resolution may never be reached through the settlement. See id. at 3 ("[I]t is possible that the Effective Date will not be reached by the original Dismissal Date, or potentially anytime thereafter."). Additionally, the agreement expressly provides that the agreed-upon resolution of this litigation—after the completion of the required essential terms—is a dismissal following the filing of a stipulation of discontinuance by Nuss. Id. at 2, 4.

In Janus Films, the Second Circuit extensively discussed the various resolutions of a case following settlement:

> Lawsuits ended by agreement may either be dismissed by stipulation, or may culminate in a judgment. If dismissed by stipulation, the judge normally plays no role whatever, standing "indifferent" to the terms the parties have agreed to. . . . Where a settled lawsuit results in a judgment, the court enters either a consent judgment or what might

12

be called a "settlement judgment." With a true "consent judgment" all of the relief to be provided by the judgment and all of the wording to effectuate that relief is agreed to by the parties. . . . With a "settlement judgment" the parties have agreed on the components of a judgment, including the basic aspects of relief, but have not agreed on all the details or the wording of the judgment. . . . Since the parties have agreed only upon the basic aspect of relief, the judge is obliged to determine the detailed terms of the relief and the wording of the judgment. In determining the details of relief, the judge may not award whatever relief would have been appropriate after an adjudication on the merits, but only those precise forms of relief that are either agreed to by the parties, or fairly implied by their agreement.

801 F.2d at 582 (citations omitted).

Here, where the parties' obligations are left purposefully open to future agreements, the terms of which are largely governed by the application of foreign law, the Court lacks the required clarity to "determine the detailed terms of the relief and the wording of the judgment" that would be appropriate to enforce the parties' settlement agreement. Id. Additionally, the agreement provides that the case should be terminated not with judgment against the Sabads, but instead by a stipulated dismissal of Nuss's suit. Gonzalez Decl. Ex. 1, at 2, 4. Since the agreement does not expressly provide for resolution through a judgment enforcing its terms, and instead embraces the need for future agreements while contemplating the possibility for impasse and the restoration of this case to active litigation, it would be inappropriate for the Court to enter judgment enforcing the terms of the settlement agreement.

The nature of the order Nuss seeks further demonstrates that the agreement—at least at its present cannot be summarily enforced. Given the omission of detail and the need for additional agreements explicitly contemplated by the agreement, see id. at 3 ("[T]he Essential Terms contemplate further agreements between the parties necessary to implement the purposes of this

Agreement . . . ."), Nuss requests that the Court direct the Sabads to perform the essential terms

of the agreement in Nuss's desired order "and to act in accordance with it as a willing party

should." Settlement Mem. at 18. The Court will not serve as an Article III chaperone guiding the

parties through possibly endless negotiations. Such a contract—requiring additional, future

agreements on its face and anticipating the possibility that a final resolution may never be

reached—cannot be enforced by motion in this Court.

This is not to say that there is no possible claim that Nuss could state concerning breach

of the Settlement Agreement or for failure to proceed in good faith (nor that the Sabads could not

adequately defend against such claims or even assert claims of their own). However, given the

terms of the Settlement Agreement, the parties' current progress (or lack thereof) under that

agreement, and the significant factual dispute concerning the parties' actions after the agreement

was signed, the Court will not enter a judgment in this action or order the Sabads to divide the

property based on the Settlement Agreement alone. If Nuss would like to pursue claims against

the Sabads concerning the collapse of the Settlement Agreement, she must initiate a separate

legal action based either on the terms of the agreement or on the implied covenant of good faith

and fair dealing. The former is too porous and the latter too fact-intensive to permit summary

disposition in this case.

### C. Request for Sanctions

Nuss's Settlement Motion also nominally requests sanctions against the Sabads in its title

and in the introduction and conclusion. Settlement Mem. at i, 1, 19. Nowhere in the brief does

Nuss make any argument as to why sanctions are appropriate, however, and she only first raises

an argument for sanctions in her reply. Dkt. No. 184 ("Settlement Reply") at 9–10. This alone is

a sufficient ground to deny Nuss's request for sanctions. See Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 568 n.4 (2d Cir. 1998) ("Because Tischmann did not raise the argument . . . until his reply brief, we consider it waived."); Gaudette v. Saint-Gobain Performance Plastics Corp., No. 11-CV-932, 2014 WL 1311530, at *22 (N.D.N.Y. Mar. 28, 2014) ("It is well-settled that arguments raised for the first time in a reply memorandum are waived and need not be considered.").

Even considering the merits of her argument, Nuss has failed to demonstrate that sanctions are appropriate in this matter. The one case cited by Nuss in her reply is inapposite here, as it concerned discovery sanctions under Rule 37 and the failure to respond to interrogatories. Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 639 (1976) (citing Fed. R. Civ. P. 37)). Nothing in Nuss's papers suggests that sanctions would be appropriate under either Rules 11 or 37, and the settlement agreement—executed months after the Court entered its Conditional Judgment—was not subsumed into that order, as Nuss seems to imply. See Settlement Reply at 9. While the Court possesses inherent powers to sanction litigants and their attorneys outside the confines of the Federal Rules of Civil Procedure or other statutes, see, e.g., Ceglia v. Zuckerberg, 600 F. App'x 34, 36 (2d Cir. 2015) ("A court has 'inherent power' to 'fashion an appropriate sanction for conduct which abuses the judicial process.'" (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991))), cert. denied, 136 S. Ct. 823 (2016), Nuss has failed to demonstrate that the Sabads' conduct here constituted bad faith, see Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980) ("[T]he trial court did not make a specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad

faith, a finding that would have to precede any sanction under the court's inherent powers."). As such, the Court finds that sanctions would be inappropriate at this juncture.

## IV.    SUMMARY JUDGMENT STANDARD

The Court now turns to address the Sabads' Summary Judgment Motion. Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir.1998). As such, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## V.  DISCUSSION

### A.  Statute of Limitations Defenses

The bulk of the Sabad's summary judgment papers are dedicated to statute of limitations defenses, arguing that Nuss's fraudulent misrepresentation, breach of fiduciary duty, conversion, and unjust enrichment claims are all untimely. Summ. J. Mem. at 8–11, 13–15. The core of this argument is that Nuss's claims all accrued by April 2003 at the latest, "almost seven years before this action was commenced." Id. at 9. This is because, by then, the parties had agreed to purchase the land, the Nusses transferred the funds to the Sabads, and the land was in fact purchased. See id.

The longest statute of limitations that may be applicable here is that for fraud, which allows for an action to be commenced six years after it accrues. N.Y. C.P.L.R. 213(8).[5]

---

[5] In the introduction to the argument section of their brief, the Sabads allude to the application of Mexico's statute of limitations for disputes among corporate shareholders. Summ. J. Mem. at 7–8 (citing Código de Comercio [CCom], art. 1045(I), Diario Oficial de la Federación [DOF] 10-07-1889, últimas reformas DOF 07-04-2016 (Mex.)). However, this assertion is never fleshed out in the body of their argument, and foreign law is never again mentioned in their brief. Because the Sabads have failed to establish—based on the undisputed facts on summary judgment—that Nuss's claims accrued in Mexico (and because they do not raise this argument at all), the Court only applies New York's statute of limitations in deciding this motion. See N.Y. C.P.L.R. 202 (providing that New York's limitations periods are always applicable, but allowing shorter foreign limitations periods to govern against out-of-state plaintiffs for claims that accrued outside of New York); cf., e.g., Global Fin. Corp. v. Triarc Corp., 715 N.E.2d 482, 485 (N.Y. 1990) ("When an alleged injury is purely economic, the place of injury [and thus accrual] usually is where the plaintiff resides and sustains the economic impact of the loss.").

Since—according to the Sabads—that accrual was in 2003, Nuss is barred from recovery. That statute contains an exception, however, allowing fraud cases to also be brought within "two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." Id. But the Sabads argue that even under this discovery rule, Nuss's fraud-based claims are still time barred. This is because in Nuss's own Complaint, she alleges that she learned in March or April 2007—three years before this case was filed—that the true purchase price of the property was less than she had been led to believe. Compl. ¶ 36; Summ. J. Mem. at 3.

In her brief, Nuss does not dispute any of this. See, e.g., Dkt. No. 175 ("Summary Judgment Opposition") at 7 n.2. Instead, she argues that while some injury did occur in 2003 based on the Sabad's failure to match their funds in purchasing the property, a far more significant injury—and a part of the same fraudulent scheme—occurred on September 18, 2007, when the Sabads diluted the Nusses' ownership interest in BRJV. Id. at 6–8.

Though somewhat difficult to glean from her papers, it appears that Nuss is claiming that the dilution injury should be viewed under the continuing wrong doctrine, thus restarting her limitations clock. See id. at 7 ("September 18, 2007, is the date of the accrual of the fraud-based causes of action, because that is when the Sabads, in diluting the Nusses' shares in BRJV as part of their ongoing and continuing scheme, caused the damage to the Nusses."). Though perhaps inartfully argued, the Court agrees.

"The continuing wrong doctrine 'is usually employed where there is a series of continuous wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act.'" Myers Indus., Inc. v. Schoeller Arca Sys., Inc., No. 14-CV-7051, 2016 WL 1092673, at *8 (S.D.N.Y. Mar. 21, 2016) (quoting Selkirk v. State, 671

18

N.Y.S.2d 824, 825 (App. Div. 1998)); see also Butler v. Gibbons, 569 N.Y.S.2d 722, 723 (App. Div. 1991) (reserving dismissal of a complaint on statute of limitations grounds because "a new cause of action accrued each time" the defendant caused a new injury to the plaintiff as part of his scheme). This doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct." Selkirk, 671 N.Y.S.2d at 825.

In this case, the conduct alleged by Nuss is sufficient to infer a continuing wrong, namely a scheme to trick the Nusses into paying more than they should for land that they would not even be able to keep. As alleged by Nuss, the culmination of this scheme was largely seen in the dilution of their stake in BRJV, since it was this act that dramatically reduced their indirect ownership stake in the land they paid for in 2003. See Summ. J. Opp'n at 6–7; Compl. ¶¶ 35–48. Furthermore, this additional action—the dilution of the Nusses' ownership interest in BRJV—is properly viewed as an additional unlawful act and not as a "continuing effect[] of earlier unlawful conduct." Selkirk, 671 N.Y.S.2d at 825. This is because the dilution was not the logical consequence of the Sabads' statements and land purchase in 2003, but instead required additional, affirmative (and, according to Nuss, malicious) acts by the Sabads. See, e.g., Pl.'s SMF pt. III, ¶¶ 4–7 (describing the September 18, 2007 shareholder meeting and the related conduct of the Sabads). As such, the Sabads have failed to establish that Nuss's claims accrued prior to September 18, 2007, and are not entitled to summary judgment on that basis.

While Nuss's claim for fraudulent misrepresentation is clearly "based upon fraud," N.Y. C.P.L.R. 213(8), and thus is timely as having accrued less than six years before the Complaint was filed, her other claims were also timely filed based on the facts available at summary judgment. At the outset, Nuss's claims for breach of fiduciary duty and unjust enrichment also

have a six-year statute of limitations. N.Y. C.P.L.R. 213(1); Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 518 (2d Cir. 2001); cf. Maric Piping, Inc. v. Maric, 705 N.Y.S.2d 684, 685 (App. Div. 2000) ("The equitable claim for the imposition of a constructive trust is governed by the six-year Statute of Limitations of CPLR 213(1) . . . ."). When measured from the September 18, 2007 shareholder meeting, these claims are timely filed. Similarly, her claim for conversion is subject to at least a three-year statute of limitations, N.Y. C.P.L.R. 214(3); Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 394 (S.D.N.Y. 2010), and thus is also timely.[6]

Some district courts have doubted whether the continuing wrong doctrine may extend the limitations period for a conversion claim. Parks v. ABC, Inc., No. 06-CV-1364, 2008 WL 205205, at *5 (S.D.N.Y. Jan. 24, 2008); Songbyrd, Inc. v. Estate of Grossman, 23 F. Supp. 2d 219, 223 (N.D.N.Y. 1998); Tinker v. Abrams, 640 F. Supp. 229, 232 (1986). At least two of these cases concerned the continuing effects of a single conversion, as opposed to the multiple, related wrongs alleged in Nuss's suit. See Songbyrd, 23 F. Supp. 2d at 220–21 (discussing a single licensing of musical recordings); Tinker, 640 F. Supp. at 232 (considering the wrongful custody of a child and comparing it to conversion instead of an ongoing trespass). But see Parks, 2008 WL 205205, at *5 ("[T]here is no continuing wrong such that every new act that might constitute conversion would restart the limitations period."). More importantly, each of these cases entirely relies, either directly or indirectly, on the Court of Appeals's decision in Sporn v.

---

[6] Nuss's conversion claim may also be subject to the six-year limitations period for fraud. See, e.g., Loeuis v. Grushin, 5 N.Y.S.3d 283, 287 (App. Div. 2015) ("The fourth cause of action, alleging conversion based upon fraud, is not time-barred, since it is governed by the statute of limitations set forth in CPLR 213(8)."); Ingrami v. Rovner, 847 N.Y.S.2d 132, 134 (App. Div. 2007) (same); Petrou v. Karl Ehmer Int'l Foods, Inc., 561 N.Y.S.2d 487, 488 (App. Div. 1990) (same).

MCA Records, Inc., 448 N.E.2d 1324, 1326 (N.Y. 1983). But Sporn was not discussing continuous wrongs in the sense used above, and instead concerned the continuous trespass doctrine, a doctrine that creates "[a] continuing right . . . where there is an [ongoing] interference with but no destruction or conversion of property." Id. (quoting Sachs v. Cluett, Peabody & Co., 39 N.Y.S.2d 853, 857 (App. Div. 1943), aff'd, 53 N.E.2d 241 (N.Y. 1944)). This reasoning does not seem applicable to cases in which there is a series of related but separate harms as seen in New York's modern continuing wrong doctrine.

The continuing wrong doctrine has been applied in a broad range of cases in this state, suggesting that this Court should not limit the doctrine to particular causes of action in the absence of such direction from the New York state courts. See, e.g., Neufeld v. Neufeld, 910 F. Supp. 977, 981–83 (S.D.N.Y. 1996) (applying the doctrine to claims for intentional infliction of emotional distress); Harvey v. Metropolitan Life Ins. Co., 827 N.Y.S.2d 6, 6–7 (App. Div. 2006) (deceptive trade practices); Affordable Housing Assocs., Inc. v. Town of Brookhaven, 13 N.Y.S.3d 876, 879 (Sup. Ct. 2015) (breach of contract and implied covenant). Indeed, the only New York case the Court could find addressing this issue suggests that the doctrine can be applied in conversion cases. See Doukas v. Ballard, No. 9267-11, 2013 WL 2129137, at *5 (N.Y. Sup. Ct. May 1, 2013) (analyzing a conversion claim under a continuing wrong theory but determining that there was no continuing wrong in that case). Based on the facts established on summary judgment, the Sabads have not shown that Nuss's conversion claim accrued prior to September 2007. Therefore, the Sabads' request for summary judgment on statute of limitations grounds is denied.

### B. Duplicative Claim Arguments

In addition to their statute of limitations arguments, the Sabads also argue that Nuss's claims for unjust enrichment and constructive trust should be dismissed as duplicative of her "conventional tort claims." Summ. J. Mem. at 11–12, 14–15. While the Sabads cite no cases on this point concerning the constructive trust claim, the case they rely on for their unjust enrichment argument is illustrative:

> [U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled. An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.

Corsello v. Verizon N.Y., Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012) (citations omitted). This follows from the general principle that equitable remedies are unavailable when a plaintiff has an adequate remedy at law. See, e.g., Samiento v. World Yacht Inc., 883 N.E.2d 990, 996 (N.Y. 2008).

On summary judgment, the Sabads have failed to demonstrate that no reasonable trier of fact could find unjust enrichment or constructive trust without establishing all the elements for one of Nuss's claims sounding in law. For example, even if the jury determines that the Nusses did not rely on the Sabads' allegedly fraudulent statements, the Court could still find that the Sabads received a benefit (whether the funds, the land, or the ownership stake in BRJV) that aught to in "equity and good conscience" be turned over to Nuss. Corsello, 967 N.E.2d at 1185. If this were the case, Nuss would not have "an adequate remedy at law," Samiento, 883 N.E.2d at

996, and Nuss's equitable claims for unjust enrichment and constructive trust therefore are not duplicative of her other claims.

The facts of Corsello—the sole decision cited by the Sabads on this point—are distinguishable from this case. In Corsello, the harm complained of was the continued attachment of a telephone terminal box to the plaintiffs' building. 967 N.E.2d at 1179. The plaintiffs' claims for either trespass or inverse condemnation could not fail while still permitting an unjust enrichment claim: Verizon was either entitled to place their box on the building, or they were not. See id. at 1180–83 (describing the related trespass and inverse condemnation claims). In this case, the Court is not convinced that for the tort claims alleged by Nuss, the loss of any one element would preclude equitable recovery under a theory of unjust enrichment or via constructive trust. As such, and given the limited range of undisputed facts before the Court on this Summary Judgment Motion, the Court will not dismiss these claims.[7]

### C. Multiple Summary Judgment Motions

Finally, the Court notes Nuss's argument that the Sabads' Summary Judgment Motion "is procedurally improper because they raise arguments that should have been addressed in their first motion for summary judgment." Summ. J. Opp. at 9–10. In this district, and in federal courts generally, "piecemeal summary judgment motions are disfavored." Miller v. City of Ithaca, No.

_____

[7] Additionally, while the Sabads ask the Court to deem Nuss's equitable claims abandoned based on her failure to respond to their summary judgment arguments, Dkt. No. 183 ("Summary Judgment Reply") at 5–6, the Court declines to do so in this case, see Orraca v. Pilatich, No. 05-CV-1305, 2008 WL 4443274, at *3 (N.D.N.Y. Sept. 26, 2008) (noting that, even when a party fails to respond to a motion for summary judgment, the court should still determine whether the defendant is entitled to judgment as a matter of law; see also Green v. LaClair, No. 07-CV-0351, 2012 WL 1048764, at *4 (N.D.N.Y. Mar. 28, 2012) (finding that when a party fails to respond to an argument on summary judgment, the moving party must still demonstrate "facial merit").

10-CV-597, 2010 WL 3809842, at *9 n.6 (N.D.N.Y. Sept. 22, 2010). It also appears that the arguments raised by the Sabads—namely, that several of Nuss's claims are either time barred or duplicative—could have been raised in their original motion for summary judgment.

Despite this policy concern, "[t]he Court certainly has discretion to review a successive summary judgment motion." Robinson v. Heschel, No. 10-CV-6212, 2014 WL 1257287, at *8 (S.D.N.Y. Mar. 26, 2014) (quoting Siemens Westinghouse Power Corp. v. Dick Corp., 219 F.R.D. 552, 554 (S.D.N.Y. 2004)). Since, in a series of orders, Judge Dancks added a second deadline for dispositive motions, e.g., Dkt. No. 132, the Court has in fairness considered the merits of the Sabads' Summary Judgment Motion. However, in light of the protracted course of this litigation and the completion of ordinary discovery, no further dispositive motions may be filed in this case without prior leave of the Court.

## VI.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Nuss's Settlement Motion (Dkt. No. 166) is **DENIED**; and it is further

**ORDERED**, that the Sabads' Summary Judgment Motion (Dkt. No. 139) is **DENIED**; and it is further

**ORDERED**, that no further dispositive motions will be permitted without leave of the Court; and it is further

**ORDERED**, that the discovery and motion cutoffs established by Judge Dancks's May 8 and 28, 2014, orders (Dkt. Nos. 132, 136) remain in force; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      July 28, 2016
              Albany, New York

Lawrence E. Kahn
U.S. District Judge